IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 15-cv-02218-PAB-KLM

KENNETH R. ZARTNER,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
SHAWN L. MILLER,
DAVID PACHECO,
ROBERT MAZOTTI,
MARIO GALLARDO,
CRAIG PENSON,
JEFFREY STEED,
RICHARD GILSTRAP, and
APRIL KULHANEK, R.N.,

     Defendants.

_____

**ORDER**

_____

     This matter is before the Court on the Motion for Summary Judgment by

Defendant April Kulhanek, R.N. [Docket No. 86], Defendant Officer Shawn L. Miller's

Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Docket No. 87], the

Motion for Summary Judgment by Defendants Pacheco, Mazotti, Gallardo, Steed,

Gilstrap and Penson [Docket No. 88], and Defendant City and County of Denver's

Motion for Summary Judgment [Docket No. 89]. The Court has jurisdiction pursuant to

28 U.S.C. § 1331.

## I. BACKGROUND[1]

On October 9, 2013, defendant Shawn Miller, a police officer with the Denver
Police Department, responded to a report of a burglary in progress.  Docket No. 87 at 4,
¶¶ 1-3.  Paul Wuthrich, one of the reporting witnesses, told Officer Miller that he had
observed a male suspect, later identified as plaintiff Kenneth Zartner, getting into a van.
*Id.*, ¶¶ 6-7.  The witness believed that plaintiff may have been committing a burglary.
*Id.*, ¶ 2.

Officer Miller contacted plaintiff and spoke with him.  *Id.*, ¶¶ 3-4.  When Officer
Miller spoke to plaintiff, plaintiff gave a false name because there was a warrant out for
his arrest.  *Id.*, ¶ 8.  While speaking with plaintiff, Officer Miller determined that the
license plates on the van were registered to a different vehicle.  *Id.* at 5, ¶ 9.  After
determining that the van had been reported stolen, Officer Miller arrested plaintiff for
aggravated theft of a motor vehicle.  *Id.*, ¶¶ 10-11.  Officer Miller handcuffed plaintiff
and put plaintiff in his patrol car.  *Id.*, ¶ 12.

In his deposition, plaintiff stated that soon after he was handcuffed his hands
and arms started to go numb.  Docket No. 98-3 at 2, p. 44, ll. 22-24.  After pointed
questioning during his deposition, plaintiff admitted that he did not have a specific
memory that he told Officer Miller that his handcuffs were too tight.  Docket No. 98-3 at
9, p.152, ll. 19-24.

Plaintiff was transported to the Downtown Detention Center at approximately
8:15 p.m. on October 9, 2013.  Docket No. 88 at 2, ¶ 2.  As part of the intake process,

---

[1]The following facts are undisputed unless otherwise indicated.

defendant April Kulhanek, a nurse employed by the Denver Sheriff Department, met

with plaintiff.  *Id.*, ¶ 3.  Nurse Kulhanek did not observe any trauma at that time and

plaintiff did not report any injuries to her.  *Id.*

After being seen by Nurse Kulhanek, plaintiff remained in the intake area.  *Id.*

at 3, ¶ 4.  Plaintiff refused to be fingerprinted, a routine and necessary part of the

booking process.  *Id.,* ¶¶ 4-5.  Plaintiff waited in the intake area of the jail for

approximately ten hours, after which time Sergeant Craig Penson ordered that plaintiff's

fingerprints be taken.  *Id.,* ¶ 4.  Deputies Pacheco and Mazotti, deputies with the

Denver Sheriff Department, were assigned as fingerprint officers at that time.  *Id.*, ¶ 7.

In order to take fingerprints, the deputies have to roll the fingers of each hand on

the fingerprinting machine.  *Id.*, ¶ 7.  When Deputy Pacheco brought plaintiff to the

fingerprinting machine, plaintiff told Deputy Pacheco that his right wrist was injured.

Docket No. 99 at 7, ¶ 11.  Deputy Pacheco took plaintiff's hand to fingerprint it, but

plaintiff pulled away and stated that he was not going to have his fingerprints taken.

Docket No. 88 at 4, ¶ 9.  In order to take plaintiff's fingerprints, Deputy Pacheco

decided to use an Orcutt Police Nunchaku ("OPN").  *Id.*, ¶ 12.  An OPN is similar to a

nunchuk, with two ten-inch long pieces of plastic attached by a rope.  Docket No. 88-6

at 6, p. 18, ll. 11-24.  Deputy Pacheco applied the OPN to plaintiff's right wrist in order

to gain compliance from plaintiff.  Docket No. 88 at 4, ¶ 12.  While Deputy Pacheco

applied the OPN, plaintiff was fingerprinted.  *Id.*, ¶ 14.

During this process, plaintiff shouted loudly and said he was refusing to get

fingerprinted.  *Id.*, ¶ 10.  Defendant Gallardo, a deputy with the Denver Sheriff

Department, responded to plaintiff's shouts and assisted Deputy Mazotti in taking

plaintiff's fingerprints.  *Id.*  Deputy Gallardo grabbed plaintiff's left forearm and shoulder.

*Id.*

After Deputies Pacheco, Mazotti, and Gallardo took plaintiff's fingerprints,

Sergeant Penson took plaintiff to Nurse Kulhanek so that plaintiff could be medically

cleared.  *Id.* at 5, ¶ 15.  Plaintiff refused to speak with Nurse Kulhanek, and Nurse

Kulhanek did not observe that plaintiff had any injuries.  *Id.*

Later that same day, another nurse saw plaintiff.  Docket No. 99 at 8-9, ¶ 19.

Plaintiff refused to be examined by the nurse.  *Id.*  The nurse placed plaintiff on the list

to see a doctor and prescribed him 800 mg of Motrin for the next ten days.  *Id.*

On October 14, 2013, Christian Stob, a physician employed by the Denver

Sheriff Department, examined plaintiff's hands and wrists.  *Id.* at 9, ¶ 20.  Dr. Stob

ordered an x-ray of plaintiff's wrists.  *Id.*, ¶ 21.  The October 15, 2013 x-ray of plaintiff's

wrist showed a "possible triquetral chip fracture."  Docket No. 99-2 at 2.  An x-ray on

March 11, 2014 showed an "[u]nchanged triquetral fracture."  Docket No. 99-3 at 2.  Dr.

Stob stated that he has no opinion as to the cause of plaintiff's injuries, including the

triquetral fracture.  Docket No. 99-9 at 5, ll. 13-17.

On November 26, 2013, in a separate incident, plaintiff was arrested for

aggravated robbery.  Docket No. 88 at 5, ¶ 16.  While plaintiff was waiting in the intake

area, he placed his feet on an adjacent seat.[2]  *Id.,* ¶ 17.  A deputy ordered plaintiff to

---

[2]Plaintiff states that he placed his feet on the seat to alleviate abdominal pain.
Docket No. 99 at 11, ¶ 30.  Plaintiff does not, however, cite evidence in the record to
support this fact.

take his feet off of the seats, but he refused.  *Id.*  Because of plaintiff's refusal to comply

with the deputy's order, defendant Steed, a deputy with the Denver Sheriff Department,

escorted plaintiff to an isolation cell.  *Id.*, ¶ 18.  Deputies Steed and Richard Gilstrap

handcuffed plaintiff to an O-ring in the cell.  *Id.*  No force was used to handcuff plaintiff

to the O-ring.  *Id.*

At 1:15 a.m. on November 27, 2013, Nurse Kulhanek examined plaintiff.[3]

Docket No. 86 at 4, ¶ 12.  Nurse Kulhanek checked the circulation in plaintiff's hands.

*Id.*  She determined that the right handcuff was too tight and had a sergeant loosen

plaintiff's handcuff until his circulation and range of motion were normal.  *Id.*

Plaintiff claims that "the cumulative trauma by the Defendants on October 9 and

10, 2013 and November 27, 2013" injured plaintiff and resulted in plaintiff needing

carpal tunnel surgery on both of his wrists.  Docket No. 27 at 8, ¶ 31.

In 2015, Dr. Rodrigo Banegas performed endoscopic carpal tunnel release

surgery on plaintiff's left and right hands.[4]  Docket No. 88-12 at 1, ¶ 1.  With respect to

plaintiff's theory of causation, Dr. Banegas states:

> It is my opinion as an orthopedic hand surgeon that if Mr. Zartner's carpal
> tunnel symptoms, which involved median nerve distribution numbness
> and tingling, were caused by one or more acute handcuff injuries, we
> would expect to see symptoms associated with the radial nerve
> distribution that were not present in Mr. Zartner's case.  The radial nerve
> is more superficial than the median nerve, which, as its name implies, is

_____

[3]Plaintiff disputes the reason he was taken to see Nurse Kulhanek, but does not
dispute that she examined his wrists and had a sergeant loosen one of his handcuffs.
Docket No. 100 at 3, ¶ 12.

[4]Dr. Banegas performed the surgery on plaintiff's left hand on February 23, 2015.
Docket No. 88-12 at 1, ¶ 1.  Dr. Banegas performed the surgery on plaintiff's right hand
on May 28, 2015.  *Id.*

> more central in the wrist, and it is common sense that tightening of
> handcuffs would necessarily impact the more superficial radial nerve as a
> consequence of any tightening sufficient to impact the median nerve. It is
> my opinion that it would thus be speculative to attribute Mr. Zartner's need
> for carpal tunnel release surgeries to any acute handcuff trauma that
> occurred during October and November 2013.

*Id.* at 2, ¶ 3.

On February 7, 2017, defendants filed their motions for summary judgment.

Docket Nos. 86, 87, 88, 89.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (internal quotation marks omitted)).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115 (citation omitted).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Qualified Immunity

Each of the individual defendants argues that plaintiff's claims are barred by the doctrine of qualified immunity.  *See* Docket No. 86 at 7-15; Docket No. 87 at 8-11; Docket No. 88 at 7-14.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis.  *Buck v. City of*

*Albuquerque*, 549 F.3d 1269 (10th Cir. 2008).  Under the first prong of the analysis, a

plaintiff is required to "establish that the defendant's actions violated a constitutional or

statutory right."  *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting

*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001)).  The

determination of whether a violation occurs under the first prong of the qualified

immunity analysis turns on substantive law regarding that right.  *See, e.g., Casey v. City

of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007).

Under the second prong, the plaintiff must show that the constitutional right at

issue was "clearly established" at the time of the defendant's alleged misconduct.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v.

Callahan*, 555 U.S. 223, 236 (2009).  "A plaintiff can demonstrate that a constitutional

right is clearly established by reference to cases from the Supreme Court, the Tenth

Circuit, or the weight of authority from other circuits."  *Gann v. Cline*, 519 F.3d 1090,

1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006))

(internal quotation marks omitted).  A plaintiff need not identify "a case directly on point,

but existing precedent must have placed the statutory or constitutional question beyond

debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "[C]ontrary authority from other

circuits does not preclude a finding that the law in this circuit was clearly established, if

the contrary authority can be distinguished."  *Currier v. Doran*, 242 F.3d 905, 923 (10th

Cir. 2001).  "If the plaintiff fails to carry either part of his two-part burden, the defendant

is entitled to qualified immunity."  *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir.

1995).  A court may exercise its discretion in "deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances."

*Pearson,* 555 U.S. at 236.

### B.  Officer Miller's Motion for Summary Judgment

Plaintiff's first claim for relief alleges that Officer Miller violated the Fourth

Amendment by "knowingly and intentionally hand cuff[ing] Plaintiff so tightly that the

handcuffs caused excruciating pain and injury to the nerves of both of Plaintiff's wrists

and hands."  Docket No. 27 at 9, ¶ 35.  Officer Miller argues that summary judgment

should be granted in his favor under qualified immunity because plaintiff has not

presented evidence that Officer Miller violated plaintiff's constitutional rights or that the

alleged constitutional right violated was clearly established at the time.  Docket No. 87

at 6-11.

The Tenth Circuit has recognized that in certain situations "unduly tight

handcuffing can constitute excessive force where a plaintiff alleges some actual injury

from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints

(or was otherwise made aware) that the handcuffs were too tight."  *Cortez v. McCauley*,

478 F.3d 1108, 1129 (10th Cir. 2007).  To establish a "manner of handcuffing claim,"

plaintiff must show (1) that Officer Miller used more force than was reasonably

necessary, and (2) that he suffered "some actual injury" caused by Officer Miller's use

of force that is "not de minimis, be it physical or emotional."   *Fisher v. City of Las

Cruces*, 584 F.3d 888, 897 (10th Cir. 2009) (citing *Cortez*, 478 F.3d at 1129 n. 25).

Under the first part of this test, courts consider the factors set out in *Graham v. Connor*,

490 U.S. 386 (1989): (1) "the severity of the crime at issue," (2) "whether the [plaintiff]

pose[d] an immediate threat to the safety of the officers or others," and (3) "whether the [plaintiff] is actively resisting arrest or attempt[ing to flee]."  *Fisher*, 584 F.3d at 897. After applying the *Graham* factors, courts analyze the injuries suffered by the plaintiff to determine whether the manner of handcuffing rendered a police officer's use of force unreasonable.  *See Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir. 2011) (noting that after using the *Graham* factors "an examination of the resulting injury supplements" the excessive force inquiry).  The Tenth Circuit created this test because police officers "almost always may use handcuffs" and, therefore, the *Graham* factors offer "little guidance in tight handcuffing cases."  *Fisher*, 584 F.3d at 902 n. 1 (Gorsuch J., concurring).  Thus, a look at the extent of an injury claimed by the plaintiff fills "a small analytical void that *Graham* left open," and helps to identify when an otherwise lawful application of handcuffs constitutes force that a reasonable jury could find rises to the level of excessive force because an officer applied handcuffs too tightly.  *Id.* at 902.

The Court finds that the *Graham* factors weigh in Officer Miller's favor.  Officer Miller responded to the scene of an alleged burglary.  Docket No. 87 at 4, ¶ 3.  When Officer Miller approached plaintiff, plaintiff gave a false name.  *Id.*, ¶ 8.  Moreover, another witness stated that he had observed plaintiff driving a van that Officer Miller determined was stolen.  *Id.* at 4-5, ¶¶ 6-7, 9-10.  Under these circumstances, it was reasonable to use handcuffs to detain plaintiff.  *See Cortez*, 478 F.3d at 1128 ("We have little difficulty concluding that a small amount of force . . . is permissible in effecting an arrest under the Fourth Amendment.").

10

Where the initial handcuffing is permissible, the failure to adjust handcuffs may still constitute excessive force. *Id.* at 1129. Plaintiff must prove that the handcuffing caused some actual injury and that Officer Miller ignored timely complaints from plaintiff or other indicia that the handcuffs were too tight. *Id.* ("In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight."); *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209 (10th Cir. 2008). In his deposition, plaintiff stated that he did not have a specific memory of telling Officer Miller that his cuffs were too tight. Docket No. 87-1 at 9, p. 152, ll. 20-24. Because plaintiff cannot recall telling Officer Miller that the handcuffs were too tight, and presents no evidence that Officer Miller could otherwise tell that they were, plaintiff fails to carry his burden of showing that Officer Miller violated a constitutional right.

Even if plaintiff could show that Officer Miller had reason to know that the handcuffs were too tight, Officer Miller argues that summary judgment is appropriate because plaintiff does not offer any expert testimony showing that Officer Miller's actions actually injured plaintiff. Docket No. 87 at 7-8. Whether expert testimony is necessary to establish causation "depends on the nature and complexity of the medical issues in a particular case and what other evidence is available in the record." *Kellum v. Mares*, 657 F. App'x 763, 771 (10th Cir. July 25, 2016) (unpublished) (discussing the role of medical evidence in establishing a deliberate indifference claim).

The medical evidence and lay testimony in this case are inadequate to establish that Officer Miller's actions caused an actual injury.  When asked whether plaintiff had a fracture in his hand prior to his encounter with Officer Miller, plaintiff stated, "I'm not a doctor.  I don't know if my hand was fractured or not fractured.  I have no idea."  Docket No. 86-3 at 6, ll. 4-6.  Similarly, the medical evidence fails to support plaintiff's claim.  Plaintiff was seen by Nurse Kulhanek hours after Officer Miller handcuffed plaintiff.  *See* Docket No. 88-2.  Plaintiff did not state that he was injured and Nurse Kulhanek did not observe any injuries.  *Id.* at 1.

While the evidence shows that Dr. Stob ordered x-rays of plaintiff's hands and wrists on October 15, 2013 and March 11, 2014, which showed a fracture, Docket No. 99-2 at 2; Docket No. 99-3 at 2, plaintiff has offered no evidence that Officer Miller's handcuffing of plaintiff caused the triquetral chip fracture.  Dr. Stob stated that he has no opinion as to the cause of plaintiff's injuries.  Docket No. 99-9 at 5, ll. 13-17.

In 2015, Dr. Rodrigo Banegas performed endoscopic carpal tunnel release surgery on plaintiff's left and right hands.  Docket No. 88-12 at 1, ¶ 1.  After finding out that plaintiff had identified him as an expert witness on causation, Dr. Banegas prepared an affidavit stating:

> It is my opinion as an orthopedic hand surgeon that . . . it would [] be speculative to attribute Mr. Zartner's need for carpal tunnel release surgeries to any acute handcuff trauma that occurred during October and November 2013.

*Id.* at 2, ¶ 3.  Plaintiff states that summary judgment is inappropriate because he hopes to ask Dr. Banegas "whether there is a way through patient history to reach an opinion to a probability."  Docket No. 98 at 10.  Plaintiff does not provide any authority for

denying summary judgment so that he can attempt to persuade Dr. Banegas to offer a different medical opinion.[5]

Other than Dr. Stob and Dr. Banegas, plaintiff does not identify an expert on medical causation who can testify to the cause of plaintiff's injuries. Neither doctor has expressed an opinion supporting plaintiff's claim that Officer Miller's use of handcuffs caused either the triquetral fracture shown in the 2013 and 2014 x-rays or caused plaintiff's need for wrist surgery. While expert testimony is not always necessary to establish causation, plaintiff has not offered any evidence to corroborate his theory that Officer Miller's actions caused him an actual injury. *See Kellum*, 657 F. App'x at 772 (finding denial of summary judgment appropriate because the plaintiff presented an expert medical opinion that could support a jury determination in her favor).

In the absence of proof of injury, the Court finds, in the alternative, that plaintiff has failed to prove that Officer Miller violated plaintiff's constitutional rights by handcuffing him on October 9, 2013. Accordingly, plaintiff's first claim for relief will be dismissed. Docket No. 27 at 9-10, ¶¶ 33-40.

### C. City and County of Denver's Motion for Summary Judgment

Plaintiff's second claim for relief is against the City and County of Denver for a failure to supervise Officer Miller.[6] Docket No. 27 at 10-11, ¶¶ 41-46. Plaintiff alleges

---

[5]Plaintiff's response to Officer Miller's motion for summary judgment was filed on March 14, 2017. Docket No. 98. Plaintiff's motion states that Dr. Banegas was unavailable because he was leaving the country for two weeks. *Id.* at 10. Despite the apparent opportunity to question Dr. Banegas since filing the response, plaintiff has not attempted to supplement the record with any additional statements from Dr. Banegas.

[6]The Court previously found that plaintiff had failed to state a claim for failure to train Officer Miller. *See* Docket No. 97 at 7.

that, "[b]ased on its prior notice of Defendant Miller's regular use of excessive force and its failure to take any action to stop this abuse of power, the City and County of Denver was clearly and deliberately indifferent to the probability that [Officer Miller] would continue his unconstitutional conduct."  *Id.* at 10-11, ¶ 43.

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible "(1) that [the] municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).

Plaintiff's municipal liability claim is based solely on the conduct of Officer Miller.  *See* Docket No. 27 at 10-11, ¶¶ 41-46.  Because the Court has found that Officer Miller's conduct did not violate plaintiff's constitutional rights, plaintiff's claim against the City and County of Denver will be dismissed.  *See Trigalet v. City of Tulsa, Oklahoma*,

239 F.3d 1150, 1154 (10th Cir. 2001) (a municipality cannot be held liable if the actions

of its employees do not constitute a violation of a plaintiff's constitutional rights).

### D.  Deputies Pacheco, Mazotti, Gallardo, Penson, Steed, and Gilstrap's Motion for Summary Judgment

Plaintiff's third claim for relief alleges that Deputies Pacheco, Mazotti, Gallardo,

and Penson violated plaintiff's Fourth and Fourteenth Amendment rights by "us[ing]

force on Plaintiff's hands and wrists" and by failing to have plaintiff's wrists and hands

examined prior to manipulating them.  Docket No. 27 at 11-12, ¶¶ 48-49.  Plaintiff's

fourth claim for relief alleges that Deputies Gilstrap, Steed, and Penson violated

plaintiff's Fourth and Fourteenth Amendment rights by using excessive force and

denying plaintiff treatment for his serious medical needs.  *Id.* at 13-14, ¶¶ 54-60.

Deputies Pacheco, Mazotti, Gallardo, Steed, Gilstrap, and Penson argue that summary

judgment in their favor is appropriate because plaintiff cannot prove that they violated

plaintiff's constitutional rights or that those rights were clearly established.  Docket

No. 88 at 12-14.

It is generally appropriate to establish which constitutional amendment applies

before reaching the merits of a case.  *See Porro v. Barnes,* 624 F.3d 1322, 1325 (10th

Cir. 2010) (noting that the determination of the applicable constitutional provision is

important because the burden a plaintiff must meet is substantially different under the

Fourth and Fourteenth Amendment).  In the Tenth Circuit, the Fourth Amendment

governs claims by an arrestee challenging the use of force by state actors after a

warrantless arrest, but before a probable cause hearing in front of a judicial official.

*See Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991) (claims of post arrest

15

excessive force are governed by the Fourth Amendment's objective reasonableness standard until an arrestee is brought before a judicial officer for a determination of probable cause to arrest), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) ("[W]e have held that the Fourth Amendment, not the Fourteenth, governs excessive force claims arising from 'treatment of [an] arrestee detained without a warrant' and 'prior to any probable cause hearing.'") (quoting *Austin*, 945 F.2d at 1160). Accordingly, the Fourth Amendment governs plaintiff's claims against these defendants.[7]

Excessive force claims under the Fourth Amendment are governed by the objective reasonableness standard. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010). Under this standard, the "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation omitted). The reasonableness of a police officer's particular use of force is usually viewed "from the

---

[7]The record is unclear with respect to plaintiff's second arrest. The amended complaint states that plaintiff was arrested on November 26, 2013, but does not state whether a warrant was issued for plaintiff's arrest. Docket No. 27 at 6, ¶ 23. Because the Court finds that plaintiff cannot prove a violation of the Fourth Amendment, the Court need not determine whether the heightened standard under the Fourteenth Amendment would apply to the events of November 26, 2013. *See Frohmader v. Wayne*, 958 F.2d 1024, 1027 (10th Cir. 1992) ("The due process standard is more onerous than the Fourth Amendment reasonableness standard.").

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Id.* Thus, the excessive force inquiry evaluates the force used in a given

detention against the force reasonably necessary to effect detention under the

circumstances of the case.

### 1. Excessive Force on October 10, 2013 (Third Claim for Relief)

In plaintiff's third claim for relief, plaintiff argues that Deputies Pacheco, Mazotti,

Gallardo, and Penson acted unreasonably in using force to fingerprint plaintiff. Docket

No. 99 at 12-15. Deputies Pacheco, Mazotti, Gallardo, and Penson argue that they are

entitled to qualified immunity. Docket No. 88 at 7-14. Accordingly, plaintiff must prove

"that the defendant's actions violated a constitutional or statutory right." *Cochran*, 339

F.3d at 1211, and that the constitutional right at issue was "clearly established" at the

time of the defendant's alleged misconduct. *Saucier*, 533 U.S. at 201.

Under the first prong, the deputies argue that plaintiff cannot prove a

constitutional violation because the use of force was reasonable in light of the

circumstances. Docket No. 88 at 9. To determine whether the use of force was

excessive, the Court must consider both the amount of force used and the reason force

was applied. *Graham*, 490 U.S. at 397. The facts show that Deputy Pacheco brought

plaintiff to the fingerprinting machine, where plaintiff stated that his right wrist was

injured. Docket No. 99 at 7, ¶ 11. After plaintiff refused to have his prints taken,

Deputy Pacheco decided to use an OPN to gain compliance. Docket No. 88 at 4, ¶ 12.

Deputy Pacheco applied the OPN to plaintiff's right wrist for a few seconds. *Id.* While

Deputy Pacheco applied the OPN to plaintiff's right wrist, plaintiff was successfully

17

fingerprinted.  *Id.*, ¶ 14.  In order to further restrain plaintiff, Deputy Gallardo grabbed

plaintiff's left forearm and shoulder.  *Id.*, ¶ 10.  The deputies argue that this force was

appropriate because the deputies did not know that plaintiff was injured and because

fingerprinting is not an optional process for defendants.  *Id.* at 9.

Deputies Penson and Pacheco were aware of plaintiff's complaints about being

injured before plaintiff was forcibly fingerprinted.  In his deposition, Sergeant Penson

stated that he was told by Deputy Pacheco that plaintiff refused to be fingerprinted

"because of an arm injury."  Docket No. 99-10 at 5, ll. 3-6.  Before Deputy Pacheco

applied the OPN to plaintiff's right wrist, Deputy Pacheco knew that plaintiff had said his

right wrist was injured.  Docket No. 99 at 7, ¶ 11.  There is, however, no evidence that

Deputies Mazotti and Gallardo were aware of plaintiff's prior complaints.[8]  *See, e.g.,*

Docket No. 99-13 at 6-7, pp. 13-14, ll. 10-25, 1-8 (deposition of Deputy Gallardo, stating

that he was unaware of plaintiff's injuries).

The deputies also argue that the force was appropriate because fingerprinting is

a necessary component of the booking process.  Docket No. 88 at 9.  While the

objective of the deputies is a consideration in the excessive force analysis, the Court

has to consider whether the force used was excessive in light of all the facts.  *Graham*,

490 U.S. at 397.  In this case, Deputy Pacheco was aware of plaintiff's complaints

about an injury and determined to use an OPN in order to gain compliance.  A

---

[8]Even if Deputies Gallardo and Mazotti did not themselves use excessive force,
they may still be liable if they failed "to intervene to prevent another law enforcement
official's use of excessive force."  *Booker,* 745 F.3d at 422.  Because the Court
concludes that the right at issue was not clearly established, the Court need not
consider the applicability of this doctrine.

reasonable jury could conclude that the force used was excessive in these circumstances. *See Lehman v. City of Fort Wayne*, 2011 WL 8988, at *6 (N.D. Ind. Jan. 3, 2011) (finding summary judgment unwarranted where plaintiff alleged that he had told officers that his finger could not be stretched out during the fingerprinting process). Because plaintiff has presented sufficient evidence to prove that Deputies Pacheco and Penson violated plaintiff's constitutional rights, the Court turns to the second prong of the qualified immunity analysis – whether the right at issue was clearly established.

In considering whether the law is clearly established, the Tenth Circuit employs a "sliding scale": "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey,* 509 F.3d at 1284 (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)). Plaintiff cites *Fisher* and *Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990), to show that it is clearly established that the use of force is excessive where the force exacerbates a preexisting condition.[9] Docket No. 99 at 12, 18.

In *Fisher,* the Tenth Circuit held:

It is long established law of this and other circuits that a triable claim of excessive force exists where a jury could reasonably conclude that the officer handled a cooperating arrestee in a manner that the officer knew

_____

[9]Plaintiff also cites *Booker* for the proposition that plaintiff must show that the deputies' conduct violated clearly established law. Docket No. 99 at 18. *Booker* discusses principles of excessive force generally and provides a three-factor analysis for considering whether force was excessive. *Booker*, 745 F.3d at 428-29. *Booker* does not speak to the use of force in booking an inmate into a jail or address whether a plaintiff's prior injuries are relevant to the excessive force analysis.

posed a serious risk of exacerbating the arrestee's injuries, which were themselves known to the officer.

*Fisher*, 584 F.3d at 901.  The court in *Fisher* relied on in-circuit and out-of-circuit cases, including *Martin*, where the officers' actions exacerbated the plaintiff's injuries.  *Id.*  In each case cited by *Fisher,* the officers had actual or constructive knowledge that the plaintiff had been injured.  *See Fisher,* 584 F.3d at 899 ("officers . . . knew [the plaintiff] had shot himself and lay bleeding on the ground"); *Martin*, 909 F.2d at 403-04 (officers knew that the plaintiff had a fractured neck); *Howard v. Dickerson*, 34 F.3d 978, 979-81 (10th Cir. 1994) (plaintiff was wearing a neck brace and told officers that "she recently underwent neck surgery [and therefore that] handcuffing her behind her back would cause injury"); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) ("An excessive use of force claim could be premised on [officer's] handcuffing [plaintiff] if he knew that she had an injured arm and if he believed that she posed no threat to him."), *superseded by statute on other grounds as stated in Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407-08 (6th Cir. 2007); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998) ("[plaintiff] was recovering from surgery on his left shoulder and was wearing a sling on his left arm" when he encountered officers).

*Fisher* and *Martin* establish that police officers may not use force in arresting a suspect where the officers know that their actions will exacerbate an existing injury. However, plaintiff's third claim for relief is distinct from the facts at issue in *Fisher* and *Martin* in two crucial respects.  First, Deputies Pacheco and Penson were not aware that plaintiff had an actual injury; instead, they were aware of plaintiff's subjective complaints.  In *Fisher*, the suspect had shot himself and was bleeding on the ground.

20

584 F.3d at 899.  In *Martin*, the officers were informed by the suspect's physician

mother that the suspect had a fractured neck.  909 F.2d at 403-04.  While some of the

authority in *Fisher* addressed subjective complaints, in each case the circumstances

corroborated the suspect's claim of prior injury.  *See Howard*, 34 F.3d at 979-81

(plaintiff was wearing a neck brace); *Guite*, 147 F.3d at 750 (plaintiff was wearing a

sling on his left arm).  *Fisher* and *Martin* do not speak to the circumstances of this case,

where a plaintiff voices uncorroborated complaints of injury and deputies disregard his

subjective complaints.[10]

The second way in which this case is distinct from *Fisher* and *Martin* is that in

those cases the police had little or no justification for the use of force.  In each case, the

suspect had already submitted to authority, was accused of a minor crime, or was the

subject of illegal police action.  *See Fisher,* 584 F.3d at 899 (the suspect "lay bleeding

on the ground"); *Martin*, 909 F.2d at 403-04 (plaintiff was accused of a speeding

violation); *Howard*, 34 F.3d at 979-81 (plaintiff agreed to be handcuffed in front);

*Walton*, 995 F.2d at 1342 (force would be excessive if the officer believed that the

suspect "posed no threat to him."); *Guite*, 147 F.3d at 750 (force used to accomplish

illegal entry may have been excessive).  Unlike *Fisher* and *Martin*, plaintiff was

restrained in order to book him into the jail, a mandatory process of substantial interest

to the state.  *See Maryland*, 133 S. Ct. at 1970.  Plaintiff's refusal to comply with the

---

[10]As discussed in reference to Officer Miller's motion for summary judgment,
there is no evidence establishing the cause or timing of plaintiff's injuries.  Since *Fisher*
relies upon the exacerbation of an existing injury, plaintiff would be required to prove
that he was already injured when he was fingerprinted in order for his claim to survive.
The absence of any evidence regarding plaintiff's injury would therefore provide further
grounds for distinguishing *Fisher*.

booking procedures places his case in a different light than the cases discussed in

*Fisher*. *Fisher* and *Martin* do not clearly establish plaintiff's right to be free from the use

of force in the course of the deputies' attempts to fingerprint him.[11]

The Court finds that plaintiff has not met his burden of proving that the

constitutional right infringed by Deputies Pacheco, Mazotti, Gallardo, and Penson  was

clearly established.  Accordingly, plaintiff's third claim for relief will be dismissed under

the qualified immunity doctrine.[12]

### 2.  Excessive Force on November 26, 2013 (Fourth Claim for Relief)

Plaintiff claims that, on November 26, 2013, Deputies Gilstrap, Steed, and

Penson transported plaintiff to a cell and handcuffed him to an O-ring.  Docket No. 27

at 13-14, ¶ 56.  Plaintiff states that the deputies "acted unreasonably in using force

rather than having Plaintiff evaluated for his severe abdominal pain."  *Id.*  Deputies

Gilstrap, Steed, and Penson argue that summary judgment is appropriate because

---

[11]Plaintiff argues that the post order, which provides guidance to the Denver Sheriff Department intake processing unit, states that an inmate who refused to comply with the fingerprinting process should be detained in an isolation cell until his objection could be resolved.  Docket No. 99 at 16; *see also* Docket No. 88-8 (excerpt from post order).  However, "the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a 'basis of invalidation would not apply in jurisdictions that had a different practice.'" *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005) (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)).

[12]Plaintiff also states that the deputies were deliberately indifferent to his medical needs.  Docket No. 27 at 12, ¶ 49.  Neither party discusses this aspect of plaintiff's third claim for relief.  The Court notes that the record shows that the deputies took plaintiff to Nurse Kulhanek immediately after the use of force in order to have him medically cleared.  Docket No. 88-5 at 4, p. 15, ll. 6-11.  These facts do not support a claim for deliberate indifference to plaintiff's medical needs as to Deputies Pacheco, Mazotti, Gallardo, and Penson.

plaintiff concedes that Deputies Steed, Gilstrap, and Penson did not use any force.
Docket No. 88 at 11.

Under the first prong of the qualified immunity test, plaintiff is required to prove
that Deputies Steed, Gilstrap, and Penson violated his constitutional rights.  In his
deposition, plaintiff stated that, when he was taken to the isolation cell on November 26,
2013, he walked to the cell under his own power.  Docket No. 88-1 at 23, p. 79, ll. 1-5.
Plaintiff further stated that, when he was handcuffed in the cell, he did not resist and the
deputies did not have to use force to handcuff him.  *Id.* at 25, p. 81, ll. 3-18.  Based on
plaintiff's testimony, the deputies did not use force, excessive or otherwise, on
November 26, 2013.

To the extent that plaintiff claims that the use of handcuffs was improper, plaintiff
is required to show "that an officer ignored a plaintiff's timely complaints" and "some
actual injury from the handcuffing."  *Cortez*, 478 F.3d at 1129.  Plaintiff cannot meet the
first part of this test because plaintiff states that, after he was handcuffed to the O-ring,
he was promptly seen by Nurse Kulhanek who requested that a sergeant loosen
plaintiff's right handcuff.  Docket No. 99 at 11, ¶ 30.

Because plaintiff concedes that the deputies did not use excessive force against
him, plaintiff's fourth claim for relief will be dismissed.[13]

_____

[13]Plaintiff's amended complaint references deliberate indifference to plaintiff's
medical needs, Docket No. 27 at 13-14, ¶ 56, but neither defendants' motion nor
plaintiff's response references this aspect of plaintiff's claim.  The Court simply notes
that, according to plaintiff, he told the deputies that he intended to rest his feet "until I
feel better."  Docket No. 88-1 at 22, p.78, ll. 11-14.  There is no evidence in the record
that Deputies Steed, Penson, or Gilstrap were subjectively aware that plaintiff was
suffering from an excessive risk to his health or safety.  *Sealock v. Colorado*, 218 F.3d
1205, 1209 (10th Cir. 2000).  According, plaintiff's claim for deliberate indifference is

**E.  Nurse Kulhanek's Motion for Summary Judgment**

> ### 1. *Deliberate Indifference to Plaintiff's Medical Needs (Fifth Claim for Relief)*

Nurse Kulhanek asserts that plaintiff's claims against her are barred by the doctrine of qualified immunity.  Docket No. 86 at 7-15.  The amended complaint alleges that Nurse Kulhanek was deliberately indifferent to plaintiff's serious medical needs. Docket No. 27 at 14-16, ¶¶ 61-67.  In particular, the amended complaint states:

> Defendant Kulhanek's failure to have Plaintiff evaluated by a hand and wrist medical professional on October 10, 2013, and an abdominal medical professional on November 27, 2013, were in deliberate indifference to Plaintiff's serious medical needs both of which were clearly established violations of the Fourteenth Amendment to the United States Constitution.

Docket No. 27 at 15, ¶ 63.

In order to make out a claim of deliberate indifference to serious medical needs, plaintiff must prove an objective and a subjective component.  To prove the objective component plaintiff, must demonstrate that the deprivation of medical treatment was "sufficiently serious," which requires a showing that the medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).  In order to prove the subjective component, plaintiff must show that a prison official "knows of and disregards an excessive risk to inmate health or safety."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

---

appropriately dismissed.

Because plaintiff's claims fail under the subjective component of the test, the
Court need not consider whether plaintiff has sufficiently proven the objective
component of his deliberate indifference claim. *Mata v. Saiz*, 427 F.3d 745, 760 (10th
Cir. 2005). "[T]he subjective component presents a high evidentiary hurdle to [plaintiff]:
a prison official must know about and disregard a substantial risk of serious harm." *Self
v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

Nurse Kulhanek evaluated plaintiff on two occasions. When Nurse Kulhanek
saw plaintiff on October 10, 2013, plaintiff refused to speak with her. *See* Docket
No. 86-2 at 5; Docket No. 86-3 at 3, p.192, ll. 5-8. There is no evidence that plaintiff's
injuries were visible or obvious. *See id.* Given plaintiff's refusal to speak with Nurse
Kulhanek and the lack of an obvious injury, there is no evidence that she was aware
that plaintiff was injured. *See Self*, 439 F.3d at 1232 (noting that "a gangrenous hand
or a serious laceration" can demonstrate knowledge of a need for medical treatment).

On November 27, 2013, Nurse Kulhanek examined both of plaintiff's wrists to
determine whether plaintiff had adequate circulation and range of motion. Docket No.
86-2 at 3. The medical report states that, after examining plaintiff's handcuffs, she
instructed a sergeant to adjust the cuff on the right wrist "until good circulation and
[range of motion] achieved." *Id.* "So long as a medical professional provides a level of
care consistent with the symptoms presented by the inmate, absent evidence of actual
knowledge or recklessness, the [subjective component] cannot be met." *Self*, 439 F.3d
at 1233. The medical records show that Nurse Kulhanek was responsive to plaintiff's

complaint of wrist pain on November 26, 2013, and plaintiff has offered no evidence
that Nurse Kulhanek had actual knowledge of other injuries.

Plaintiff's amended complaint also alleges that he reported abdominal pain to
Nurse Kulhanek. Docket No. 27 at 15, ¶ 63. However, neither the medical reports nor
plaintiff's testimony corroborates plaintiff's complaint. *See* Docket No. 86-2 at 3
(making no reference to abdominal pain). When asked in his deposition, plaintiff did
not recall informing Nurse Kulhanek about his abdominal pain. *See* Docket No. 86-3
at 8, p. 217, ll. 3-9, 11-14; 9, p. 218, ll. 8-13 (noting that plaintiff informed the deputies
of his abdominal pain).

The medical reports and plaintiff's testimony show that Nurse Kulhanek was not
deliberately indifferent to plaintiff's medical needs. In his response, plaintiff argues that
the "reasonable thing for the nurse to do [in response to a use of force] is to ask the
escorting deputy to describe the use of force." Docket No. 100 at 5. Plaintiff, however,
offers no authority for imposing an obligation on Nurse Kulhanek to consult with
deputies when an inmate-patient refuses to answer questions. To the extent Nurse
Kulhanek could have done more to examine plaintiff, she was not constitutionally
required to do so. *See Self*, 439 F.3d at 1232 ("[T]he subjective component is not
satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises
[her] considered medical judgment.").

Plaintiff also states that Nurse Kulhanek's conduct "demonstrates a clear motive
to clear the Deputies of any misconduct and avoid the need for medical care." Docket
No. 100 at 6. Plaintiff claims that this conduct may constitute a conspiracy claim. *Id.*
The only authority cited by plaintiff is a case where officers "conspired to cover up

26

evidence that they used excessive force in shooting [a suspect]." *McGarty v. Town of Carmel*, 997 F. Supp. 435, 437 (S.D.N.Y. 1998). Plaintiff has not identified any evidence destroyed by Nurse Kulhanek, nor does Nurse Kulhanek's conduct demonstrate any nefarious intent. To the contrary, Nurse Kulhanek questioned plaintiff about his symptoms on October 10, 2013 and plaintiff refused to assist in her medical diagnoses. On November 27, 2013, Nurse Kulhanek examined plaintiff and had a sergeant loosen his handcuffs when she found they were too tight.

Because plaintiff has not offered any evidence that Nurse Kulhanek was deliberately indifferent to his medical needs, his fifth claim for relief will be dismissed. Docket No. 27 at 14-16, ¶¶ 61-67.

### 2. Nurse Kulhanek's Request for Sanctions

Nurse Kulhanek argues that she is entitled to attorney's fees under 42 U.S.C. § 1988.[14] Docket No. 86 at 17-20. Under 42 U.S.C. § 1988(b), the Court has discretion to grant "the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "A prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley v. Eckerhart*, 461 U.S. 424, 429 n.2 (1983); *see also Fox v. Vice*, 563 U.S. 826 (2011). "A complaint is frivolous where it lacks an arguable basis either in law or in fact." *Blakely v. USA Cas. Ins. Co.*, 633 F.3d 944, 949-50 (10th Cir. 2011) (alterations and internal quotation marks omitted).

---

[14]Plaintiff did not respond to Nurse Kulhanek's request for sanctions in her motion for summary judgment. *See* Docket No. 100.

Nurse Kulhanek argues that attorney's fees are appropriate because discovery made clear that Nurse Kulhanek's conduct was not wrongful and that plaintiff's claims were barred by qualified immunity.  Docket No. 86 at 17-20.  Moreover, Nurse Kulhanek attempted to confer with plaintiff regarding the frivolous nature of his claims against her, Docket No. 86-8, but claims that plaintiff did not substantively respond to this email.  Docket No. 86 at 19.

The Court finds that plaintiff's claims against Nurse Kulhanek are frivolous.  The record shows that Nurse Kulhanek's conduct was not wrongful and plaintiff's response to Nurse Kulhanek's motion for summary judgment fails to offer a single non-frivolous basis for maintaining his claims against her.  Instead of offering evidence showing that Nurse Kulhanek ignored plaintiff's complaints, plaintiff asserts a novel position: that Nurse Kulhanek was involved in a conspiracy.  Docket No. 100 at 6.  This new theory is offered without any citations to the record or other corroborating evidence.  *Id*.  Accordingly, Nurse Kulhanek is given leave to file a motion for attorney's fees in compliance with D.C.COLO.LCivR 54.3 within thirty days of this order.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Motion for Summary Judgment by Defendant April Kulhanek, R.N. [Docket No. 86], Defendant Officer Shawn L. Miller's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Docket No. 87], the Motion for Summary Judgment by Defendants Pacheco, Mazotti, Gallardo, Steed, Gilstrap and Penson

[Docket No. 88], and Defendant City and County of Denver's Motion for Summary Judgment [Docket No. 89] are **GRANTED**.  It is further

ORDERED that the complaint [Docket No. 27] is dismissed with prejudice.  It is further

ORDERED that, within 14 days of the entry of this Order, defendants may have their costs by filing a Bill of Costs with the Clerk of the Court.  It is further

ORDERED that this case is closed.


DATED September 7, 2017.

BY THE COURT:


 s/Philip A. Brimmer                          
PHILIP A. BRIMMER
United States District Judge